UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:08-CR-119-FL-1

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>)<br>WILLIAM JOSEPH INMAN )<br>)<br>DEFENDANT. ) | **MEMORANDUM AND RECOMMENDATION** |

This matter is before the Court on Defendant's motion to suppress physical evidence seized during the execution of a "no-knock" search warrant and subsequent statements made to law enforcement officers [DE-19]. The government filed a response [DE-21], and the Court conducted an evidentiary hearing on February 19, 2009, to further develop the record. At the hearing, the Court heard testimony from Wilmington Police Detective Kenneth Becker, lead investigating officer and applicant for the search warrant, Wilmington Police Detective Chris Mayo, a member of the Special Response Team ("SRT Team") that executed the search warrant, and Wilmington Police Detective Lee Odham, who questioned the Defendant, William Joseph Inman ("Inman"), after the search warrant was executed. Accordingly, this matter is ripe for ruling.

I.  **STATEMENT OF THE FACTS**

   A.  **Detective Kenneth Becker**

Detective Becker testified that his investigation began on October 22, 2007, when he was approached by the owner of a business adjacent to Two-Trees Pools & Spa ("Two-Trees") located at 112-A South Kerr Avenue in Wilmington, NC. The business owner indicated that unusual activities were occurring at Two-Trees such as people coming and going from Two-Trees late at night and without pool supplies and a man carrying a gun

was stationed outside the front door of Two-Trees. Subsequently, the owner of another business near Two-Trees corroborated the observations of the first business owner and further provided Detective Becker a list of license plate numbers from cars seen at Two-Trees, including those of Two-Tree's owners. Detective Becker ran the plate numbers and determined that one of the vehicles allegedly belonging to the owner was registered to Inman. A report of Inman's criminal history revealed that he was a convicted felon and was subject to a current Domestic Violence Protective Order.

Detective Becker went to Two-Trees to investigate the complaints. He indicated that he knocked on the door, but no-one answered and that the windows were blackened out and the shades were drawn. Detective Becker then began conducting surveillance on Two-Trees. During the surveillance, Detective Becker never saw anyone leaving Two-Trees with pool items. He observed a person would come to the door, knock, the door would be opened, and then the door would be closed behind the person. He did not see any evidence of fighting outside the building, drug activity, or alcohol use. Detective Becker next met with a confidential informant ("CI") who had been to Two-Trees and had first hand knowledge that a video gaming business was being operated on the Two-Trees premises by Inman and his father. The CI also indicated that Inman carried a firearm at all times.

Detective Becker concluded that there was illegal gaming activity occurring at Two-Trees, and on January 17, 2008, he sought and obtained from a Superior Court Judge a no-knock warrant to search Two-Trees. Detective Becker requested the warrant dispense with the knock-and-announce requirement based on a threat of danger to the executing officers. His concerns arose from the reports that a man was frequently stationed outside Two-Trees carrying a firearm, that the CI witnessed Inman carrying a firearm inside the business, that Inman was a convicted felon, and that the Domestic Violence Protective

Order indicated that Inman had previously threatened a police officer. Detective Becker was also concerned that the layout of the premises gave anyone inside a tactical advantage over the officers executing the search warrant.

During the execution of the search warrant, Detective Becker's role was support and surveillance. Although Detective Becker could not see the front of Two-Trees from his position, he indicated that he heard the SRT Team announced "police" before entry. He also testified that Inman pulled a gun and that SRT Team member Detective Lazarro shot Inman in the shoulder. After the SRT Team secured the premises, Detective Becker entered Two-Trees and observed Inman on the floor with a gun, holster, and magazine at his feet. There were four video poker/keno machines in the adjacent room along with four or five other people who had been gaming at the time the warrant was executed. Detective Becker observed a few pool liners hanging from the ceiling of the office and a few other pool related items in the adjacent room, but based on his experience he determined that Two-Trees was a front for illegal gaming activity. Inman was subsequently transported to the hospital for treatment.

### B. Detective Chris Mayo

Detective Mayo testified that he was part of the SRT Team that executed the search warrant at Two-Trees. He testified that there were approximately eight members on the SRT Team. They executed the warrant at approximately 8:00 p.m. on January 17, 2008. Two-Trees store front contained a heavily tinted window and door and there was a bar across the inside of the door. Sargent Johnson, a member of the SRT Team, made a hole in the glass window through which Detective Lazarro was able to provide cover with an M-4 carbine until the other officers breached the door. Detective Mayo testified, although he could not see Inman prior to entry, that before the officers breached the door, Inman

reached for a gun and was shot. Upon entry into Two-Trees, Detective Mayo saw Inman behind a desk and ordered him to put his hands up. He then proceeded through an open door into a bathroom where he found an elderly gentleman apparently suffering from cardiac arrest. When Detective Mayo came back into the office he saw a gun out of its holster, the holster, and a magazine on the ground behind the desk. He identified the weapon produced by the government in Court as the one he saw on the Two-Trees premises.

### C.     Detective Lee Odham

Detective Odham testified that he had not been involved in the execution of the search warrant, but that he was contacted by his supervisor and instructed to take Inman's statement at the hospital. He proceeded to the hospital where he was directed to Inman's room in the emergency area by an SRT Team member. When Detective Odham entered the room, Inman was being treated by an orthopedic surgeon. After the doctor completed his examination, Inman asked Detective Odham to identify himself. Detective Odham stated he was an investigator with the City of Wilmington Police Department and that he wanted to talk about what had happened earlier that evening. Inman reciprocated that he wanted to talk to Detective Odham. Detective Odham described Inman as lucid, energetic, and willing to talk and indicated that Inman did not appear to be under the influence of narcotics, although Detective Odham did hear Inman ask for pain medicine.

At approximately 10:40 p.m. Detective Odham read Inman his *Miranda* rights and filled out a Miranda Rights Form indicating that Inman understood his rights. Inman signed the form. The doctor was present during the questioning, and Detective Odham's partner may have also been present. Detective Odham asked Inman what had happened, to which Inman responded that he had been sitting at the desk in Two-Trees when he heard

glass break and he was shot. Inman told Detective Odham that he thought he was being robbed, then the police came in and he was placed in an ambulance and taken to the hospital. Detective Odham inquired as to how the gun found at Two-Trees got out of the holster, and Inman responded that he must have knocked it off the tower and that he did not reach for the gun until after he was shot. Inman also stated that the gun belonged to his father and provided details about the gaming operation. The interview lasted approximately 10-12 minutes.

Later that same evening, at approximately 11:15 p.m., Inman was interviewed by SBI Agent M.E. Francisco, who was investigating Detective Lazarro's shooting of Inman. Detective Odham was not present when Agent Francisco interviewed Inman and at no time had discussions with Agent Francisco regarding Inman's statements.

## II.   DISCUSSION

Inman is charged with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) & 924 [DE-1]. He argues in his motion to suppress that the evidence obtained from the search of Two-Trees and his statements made following the search should be suppressed because (1) the police violated his Fourth Amendment right to remain free of unreasonable searches and seizures when they executed the no-knock warrant at Two-Trees; (2) the statements made following the search are fruit of the poisonous tree or, alternatively, were not voluntary; (3) the police violated his Fifth Amendment right against self-incrimination; and (4) the police violated his Due Process rights derived from the grant of immunity.

### A.   The Search Warrant

The Fourth Amendment to the United States Constitution guarantees the "right of people to be secure in their persons, houses, papers, and effects, against unreasonable

searches and seizures." U.S. Const. amend. IV. "The Fourth Amendment generally requires police officers entering a dwelling to 'knock on the door and announce their identity and purpose before attempting forcible entry.'" *United States v. Singleton*, 441 F.3d 290, 293 (4th Cir. 2006)(quoting *Richards v. Wisconsin*, 520 U.S. 385, 387 (1997)). "However, exigent circumstances-like 'a threat of physical violence' to officers-may allow officers to conduct a no-knock entry." *Id.* (quoting *Wilson v. Arkansas*, 514 U.S. 927, 936 (1995)).

In the application for the no-knock warrant, Detective Becker stated that a no-knock warrant was necessary "for the safety of all persons involved in executing it" based on the following:

> [T]he owner and person in apparent control of the premises to be searched has been seen on several occasions carrying a large caliber handgun, is a prohibited possessor with an active domestic violence protective order which states that he can not possess a firearm or other weapon, has violent tendencies, and has threatened a police officer.

(Suppression Hr'g, Gov't Ex. 1.) While the Fourth Circuit Court of Appeals has indicated that a defendant's criminal history may not "decisively tip the balance toward forgoing the knock-and-announce requirement," *Singleton*, 441 F.3d at 294, the Court need not decide whether the requisite exigent circumstances existed in this case because the police reasonably relied in good-faith on the no-knock warrant.

The Fourth Circuit has previously held that the *Leon* good-faith exception may be applied to a no-knock warrant. *Singleton*, 441 F.3d at 294-95. The well-known circumstances where an officer's reliance cannot be in good faith are (1) the issuing judge was misled by false information in the affidavit; (2) the issuing judge acted as a rubber stamp for the officer; (3) the supporting affidavit lacks indicia of probable cause; and (4) the warrant is facially deficient, *i.e.* fails to particularize place to be searched or things to

be seized. *United States v. Williams*, 548 F.3d 311, 317-18 (4th Cir. 2008).

After careful review of the application for the search warrant, the Court cannot say that it is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *United States v. Leon*, 468 U.S. 897, 923 (1984). In addition to the generalized statement that persons involved in illegal gaming often keep guns and weapons on the gaming premises in order to protect the money from the operation, the affiant states with particularity that an armed guard was seen on multiple occasions outside Two-Trees, that the CI reported being on the premises and witnessing Inman carrying a firearm at all times, and that Inman had violent tendencies, was the subject of a domestic violence protective order, and had previously threatened an officer. The Court finds that the officers reasonably relied in good faith on the no-knock search warrant and that the physical evidence was properly seized.

### B. The Statements to Detective Odham and Agent Francisco

Having found no violation of Inman's Fourth Amendment rights in the execution of the search warrant, there is no basis for suppression of subsequent statements made by Inman to Detective Odham under the fruit of the poisonous tree doctrine. Inman alternatively argues that his statements must be suppressed because they were involuntary, they were made in violation of his *Miranda* rights, and they were made pursuant to an immunity agreement.

#### 1. Voluntariness

Due Process requires that statements made to the police be given voluntarily. *Schneckloth v. Bustamonte*, 412 U.S. 218, 255 (1973). Courts must evaluate the totality of the circumstances, taking into account both the characteristics of the accused and the details of the interrogation. *United States v. Davis*, 233 Fed. Appx. 292, 294 (4th Cir.

2007)(citing *Schneckloth*, 412 U.S. at 226). In the present case, Inman argues that his condition, "shot, bleeding, in handcuffs, and subject to the 'shock and awe' show of force" (Def.'s Mot. to Suppress at 8) rendered his statements involuntary.

The testimony from the hearing indicated that Inman was questioned by Detective Odham approximately two hours after Inman arrived at the hospital. It is reasonable to expect that any so-called "shock and awe" effect on Inman from the SRT Team's forced entry at Two-Trees was negated by the passage of time and the neutral setting of the hospital. Furthermore, there is no evidence that Inman was physically threatened. *See United States v. Ramirez-Martinez*, 112 F.3d 511, 1997 WL 205777, at *2 (4th Cir. 1997)(Statement made in response to questioning fifteen minutes after forcible entry into defendant's home found to be voluntary despite the late hour of the entry, the police being armed, the defendant being handcuffed, and the police using force against a third party during the execution of the warrant.) While Detective Odham did testify that he heard Inman ask for pain medication and that Inman showed discomfort while the doctor examined the wound, he also testified that he did not see anyone administer medication to Inman before questioning, that Inman appeared "more at peace" after the doctor's examination ended, and that Inman was lucid, energetic, willing to talk and did not appear to be under the influence of narcotics. *See United States v. Cristobal*, 293 F.3d 134, 141 & n.9 (4th Cir. 2002)(confession held voluntarily despite defendant being interrogated while in the hospital and under the influence of pain killers and narcotics such as morphine). Inman presented no evidence, such as hospital records, to indicate that he was under the influence of pain killers or other drugs during Detective Odham's interrogation. Consequently, the Court finds that the statements made to Detective Odham were voluntary.

### 2. *Miranda* Warning

Inman's decision to waive his Fifth Amendment privilege against self-incrimination must also have been voluntary, and requires the same inquiry as when analyzing the voluntariness of statements under the Due Process clause. *Id.* at 140. After Detective Odham introduced himself to Inman as a police officer, informed Inman that he was there to question him regarding the incident at Two-Trees, and Inman indicated that he wanted to talk, Detective Odham advised Inman of his *Miranda* rights. Detective Odham filled out a Miranda Rights Form and as he explained each right to Inman, he asked if Inman understood and then wrote "yes" next to each warning stated on the form. Inman and Detective Odham signed the Miranda Rights Form. There is no evidence to indicate that Inman's waiver of his Fifth Amendment privilege was involuntary. Consistent with the analysis above, the fact that Inman had been shot and was in the hospital is not enough to render his waiver involuntary, and the evidence shows that Inman was able and willing to talk. *Id.* at 141.

In addition to being voluntary, Inman's waiver must also be knowing and intelligent. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Evidence that Inman's decision making was hindered by pain medication or other drugs would be relevant to his ability to give a knowing and intelligent waiver. *Cristobal*, 293 F.3d at 142. However, as previously discussed, there is no evidence to support that Inman's decision making ability was compromised in any way. Consequently, the Court finds that Inman's waiver was knowing and intelligent.

### 3. **Immunity Agreement**

Finally, Inman argues that his statements should be suppressed because he was granted immunity by Agent Francisco for anything Inman said during Francisco's interview

with Inman. The government does not contend that Inman's statements to Agent Francisco are admissible. However, Inman, at the hearing, argued that Inman's *prior* statement to Detective Odham was tainted by the subsequent grant of immunity by Agent Francisco. The Court fails to see how Inman could have, at the time of his statement to Detective Odham, had any expectation that the statement would not be used against him based on a grant of immunity that had not yet been given by Agent Francisco. To the contrary, Detective Odham testified that he advised Inman that his statement could and would be used against him in court, as noted on the Miranda Rights Form. The Court finds that Inman's statement to Detective Odham did not violate the grant of immunity by Agent Francisco.

### III. CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that Defendant's Motion to Suppress [DE-19] be **DENIED**.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have ten (10) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a *de novo* review by the District Court on an issue covered in the Memorandum and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

This 07Th day of February, 2009.

DAVID W. DANIEL
United States Magistrate Judge